M.H. TELFORD
68 West 100 North
P0 Box #168
Malad City, Idaho 83252
1-877-670-5872
Attorneys Pro Se



## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF IDAHO

|  |  |
|---|---|
| H.M. TELFORD | ) |
| | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| vs. | ) |
| | ) |
| LADD BROWN, BARRY BROWN | ) |
| AS AGENT FOR LADD BROWN, | ) |
| PAUL C. HESS, PESONALLY AND | ) |
| AS VICE PRESIDENT OF BEEHIVE | ) |
| CREDIT UNION, BEEHIVE CREDIT | ) |
| UNION, AMBER ALLEN, FIRST | ) |
| AMERICAN TITLE INSURANCE CO. | ) |
| JEFF BARNES AND DOES 1-10. | ) |
| | ) |
| **Defendants** | ) |

Case No. CV 2005-139

VERIFIED COMPLAINT

CIV 05 - 460 - E - MHW

DEMAND FOR JURY TRIAL

## COMES NOW PLAINTIFFS AND ALLEGE THE FOLLOWING:

### SUBJECT MATTER JURISDICTION

1. This court has subject matter jurisdiction over the within Federal and State law causes of action pursuant to the Interstate Land Sales Act, 15 U.S.C. § 1701, *et seq.*, the Federal Fair Housing Act, 42 U.S.C. § 3601 et seq., the Idaho Consumer Protection Act, section 48-601, et seq., The Federal and Idaho Racketeering Acts, section 18-7801, et. seq.. and tortious interference with contract and economic gain, and the Diversiity Clause.

*l*

## PERSONAL JURISDICTION

2.    This Court has personal jurisdiction over the defendants pursuant to <u>42</u> <u>U.S.C. § 3613</u> which provides a private right of action against any offender of the Fair Housing Act... in a State or local court of general jurisdiction where any offense  had an impact on plaintiff;      Title 18 USC section 1965(b) providing for a long arm statute for service of process under RICO and for personal jurisdiction in the forum state where at least one defendant does business;   Under the Interstate Land Sales Practices Act. And over plaintiff's state law causes of action for  violations of  Idaho and Utah's Racketeering Act and Idaho's Consumer Protection Act under the Supplemental Jurisdiction statute.

## RESIDENCE ALLEGATIONS

3.  Plaintiff H.M. Telford is a resident of the County of Oneida, State of Idaho.

4.  Plaintiff Marti Telford is a resident of the County of Oneida, State of Idaho.

5.  Defendant Ladd Brown is a resident of the County of Salt Lake, State of Utah.

6.  Defendant Barry Brown as agent for Ladd Brown is a resident of Utah County, State of Utah.

7.    Defendant Paul C. Hess, personally resides in Salt Lake County, State of Utah.    Defendant Paul C. Hess as Vice President of Beehive Credit Union resides in Salt Lake County, State of Utah.

8.    Defendant Beehive Credit Union, is a resident of Salt Lake County, State of Utah.

9.    Defendant Amber Allen as an employee of Beehive Credit Union and a resident of Salt Lake County, State of Utah.

10.   Defendant First American Title Ins. Company is a resident of County of Utah County, Utah who does business in Bannock County, Idaho and whose trust account was used as a source of extortion by all other defendants.

11.    Defendant Jeff Barnes is sued only in his trust capacity as an employee of First American Title,  the holder of the escrow funds deposited by Telford.

12.   DOES defendants are all sued herein.

## GENERAL FACT ALLEGATIONS

2.

12. On April 30, 2003 and before, defendant Ladd Brown owned certain real property in Utah County, Utah and then designated as the back yard lot to real property bearing citus address 280 South 1200 West in Orem, Utah 84057.

13. Ladd Brown had a partnership interest in Brown Construction, started by Ladd Browns father, Barry Brown. Ladd Brown and Barry Brown had planned on constructing several multiple dwelling complexes on the back lot.

14. To implement the construction project which required separate utilities to be run to the property, on or before April 30, 2003, Ladd Brown and Kayle Brown, the brother of Ladd Brown and the owner of the front lot, executed a subdivision lot agreement whereby Ladd Brown became the sole owner of the back yard lot. Ladd Brown then recorded the lot subdivision with the Utah County recorders office and the Utah County Recorders office designated a separate parcel number to the back lot.

15. During the subdivision process, the Browns never obtained permission from Orem City to subdivide their lots and therefore the separate lot was not legally recognized by Orem City as a subdivided lot.

16. In pursuit of constructing the multiple dwellings on the land lot, on April 30, 2003, Ladd Brown obtained a loan against the back yard lot in the amount of $41,250 from Beehive Credit Union. Defendant Paul Hess, Vice President of Beehive Credit Union, admittedly authorized the loan against the subject real property. A standard note securing the indebtedness was executed between Ladd Brown and Beehive Credit Union and the note was collateralized by a Trust Deed secured against the real property. The Trust Deed was then subsequently recorded in the Utah County Recorder's office. Attached hereto as exhibit "A" is a true and correct copy of the trust deed.

17. Over the next several years, the Browns never constructed or otherwise improved the properties. Eventually, the City of Orem passed zoning laws which prevented the Browns and other equally situated from using the lots in the given area as multiple dwelling properties. Ladd Brown decided to sell the property. He offered sale of the 1/3 acre undeveloped lot for $55,000.

18. At the time of the offer, the Browns confirmed with plaintiffs that the lot had been subdivided and that the city of Orem was in the process of certifying approval of the subdivision. However, Plaintiffs contacted the city of Orem and learned that the subdivision would not be approved until the utility lines were installed and the hook in fees

3.

were paid to the city of Orem. In countering the offer, the parties agreed that a $15,000 deposit made by TELFORD to the escrow account to secure title, would be used as bond funds to expedite the utilities installation and hook up fees in order to formalize the approval of the subdivision plat map by Orem City.

19.    Ladd Brown purported to prepare and author a Purchase Land Agreement in line with the parties agreements.    When the contract was presented to TELFORD, the sale price of the land had increased by $6,000 over and above the agreed upon offering price of $55,000.    Ladd Brown unilaterally changed the sale price to $61,000 reportedly to cover the costs to run the utilities to the lot and pay the hook in fees with Orem City.    When Ladd Brown submitted the contract to plaintiff Telford,    he refused to define the scope or the quality of the work, he refused to guarantee the work with an insurance policy as was required by Orem City, and he refused to perform the installation work at the front of escrow instead at the tale end.    Accordingly, Telford corrected the contract to reflect the agreed upon price.    Both parties signed the Land Purchase agreement.    See exhibit "B" attached for corrections on the Purchase Land agreement.

20.    Ladd Brown presented an Addendum prepared by an attorney/relator friend of Ladd's.  The Addendum to the Purchase agreement provided that the monies to install utilities and  hook in fees to Orem City's lines  would be funded  from the $15,000 down Telford agreed to pay in order to open escrow;  but contrary to the parties oral agreement,  the Addendum provided that Ladd Brown would not perform upon the "Orem City job" until at the close of escrow and until after TELFORD had deposited $55,000 into the escrow account.   The Addendum also surprisingly included a default provision which provided that Ladd Brown was entitled to "earn" the $15,000 deposit placed in escrow by TELFORD   if TELFORD defaulted on the Purchase contract.    In other words the Addendum was completely one sided in that it did not require any performance on Ladd Brown's part until at the tail end of the escrow. Suspicious, TELFORD wrote in an escape clause on the $6,000 note payments which provided that she would  pay the interest on the Beehive loan until the Beehive contract was satisfied.    There was no deadline for the escape provision.    See exhibit "C" attached hereto for a true and correct copy of the Addendum.    TELFORD would not sign the addendum until she received an oral guarantee  from Ladd Brown that the Orem job would cost no more than the $6,000 Ladd

4.

Brown originally tried to fix into the Real Estate Purchase contract found at exhibit "B" attached. Ladd Brown guaranteed the costs of the OREM job would be no more than $6,000 if TELFORD used Ladd Brown's excavator, which Telford ultimately did. The parties signed the Addendum.

21. On July 12, 2005, when all parties appeared to open the escrow at First American Title Company, Ladd Brown announced to the title officer and trustee, Jeff Barnes, that Barry Brown, Ladd's father, had a power of attorney by Ladd Brown and was authorized to execute and handle all further matters concerning the real property until close of escrow and transfer of title to TELFORD. Because of this representation, the trustee obtained copies of the drivers licenses of Ladd and Barry Brown.

22. After the purchase agreement and addendum were executed, plaintiffs learned that in fact, the fees to install the utilities and pay for hook up fees would be almost $30,000, not $6,000. The excavator that Ladd Brown referred TELFORD to for performing the "Orem job" would not do the job for less than $13, 900. The hook in fees with Orem City were non-participating fees requiring that TELFORD pay Orem City nearly $15,000 to hook into their lines. TELFORD complained to the Browns asserting that because of their position as construction contractors, the Browns had to have known that the fees quoted by them were grossly undervalued. TELFORD asserted to the BROWNS that if TELFORD had not included the escape provision in the Addendum respecting the Beehive Note, that TELFORD would have lost the $15,000 deposit by misrepresentations and material omissions by the Browns. The Browns knew that TELFORD was using monies from her IRA account to obtain title and secure the property as a future residence for family members and that TELFORD's funds were limited.

23. To quell TELFORD, Barry Brown and Ladd Brown represented to TELFORD that she could acquire the Beehive loan which was only $300 in mortgage payments per month and use the funds originally assigned for paying off the Beehive lien, to complete the installations and move a modular home onto the real property which was owned by a relative of TELFORD's. Telford agreed to the modification and Barry Brown as Ladd's agent and Telford executed an Assignment of Trust Deed and Note agreement which bore a forum clause for Malad, Idaho. Attached hereto as exhibit "D" is a true and correct copy of the assignment agreement. The assignment contract also provided that if Ladd Brown owed any difference to TELFORD because the Beehive principal debt was

5.

greater than $40,000, that Ladd Brown would be required to reimburse TELFORD at the close of escrow. The assignment contract executed on August 15, 2005.

24.    The assignment contract thereby cancelled the deposits of $6,000 per month to the escrow company to pay off the Beehive loan because the equity difference in the sales price of the property and the lien debt by Beehive was fully covered, if not more, by the $15,000 deposit TELFORD made into escrow.

25.    The trust deed secured against the lot and bearing Beehive Credit Union as beneficiary, contained no "due on sale" clause in the trust deed and the trust deed permitted for assignment to a successor of interest on the lot with the successor of interest becoming liable for the security ties to the trust deed if ownership to the real property changed. Specifically, covenant 18 of the Trust Deed provided:

> "18.    This Trust Deed shall apply to, inure to the benefit of, and bind all parties hereto, their heirs, legatees, devises, administrators, executors, successors, and assigns."

26.    Both Barry Brown and TELFORD orally instructed the escrow officer "Jeff", to obtain a pay off statement from Beehive Credit in order to determine the true balance of the note secured by the trust deed and add that credit to the consideration supporting the purchase agreement. Barry and Telford also informed Jeff that as soon as the pay off statement by Beehive could be provided and the utilities were installed on the property and Orem City gave final plat approval, the escrow could be closed.

27.    The next day on August 15, 2005, Jeff contacted Beehive to obtain the pay off statement.    Beehive fraudulently denied that the Trust Deed permitted Telford to act as assignee to the loan or to assume the loan and therefore refused to allow Telford to make the existing loan in violation of the Fair Housing Act and Idaho's Consumer Protection Act. Beehive also imposed different terms or conditions on a new loan which required that Telford pay new and higher interest rates, points, and loan fees in violation of 42 USC sections 3604-3605 of the Fair Housing Act.

28.    After the assignment was executed, Telford used the funds originally designated to pay off Beehive and paid the bonded excavator over $15,000 for excavation fees re installation of the utilities to the property in furtherance of obtaining final plat approval and acquiring clear title to the property. Telford also tendered an additional $3,000 bond to Orem city, plus tendered a holding check for $16,351 to Orem City to pay

6.

"hook in" fees.    Telford also paid an engineer   $5,300 to draft various plot,  excavation and engineering maps.    As of the date of August 22, 2005,   Telford had invested an additional  $39,400 in additional expenditures on the real property towards obtaining title. Plaintiffs  also expended untold time and energy toward expedited improvement of the property.

        29.    On or about August 22, 2005 Brown and M.H. Telford appeared at First American Title to inquire into the disposition of the pay off demand on Beehive and the closing fees for the escrow in light of Telford's agreement to take over the Beehive note and Trust Deed.   The escrow agent "Jeff" apprised Brown and M.H. Telford that Beehive Credit Union refused to issue a pay off statement because Beehive would not allow assignment of the Note and Trust Deed.     In support of this contention,  Jeff produced exhibit "E" attached.    Telford responded by telling Jeff that there was no "due on sale" clause in the trust deed and that Beehive had no authority to interfere with Telford's right to acquire the note.  Refer back to the trust deed, exhibit "A" attached,  which shows  there is no due on sale clause and most particularly,  convenant 18 which provides that the trust can be assigned.

        30.    From August 22, 2005 to present,  M.H. Telford personally contacted Beehive Credit Union numerous times demanding that a pay off or amortization statement be issued identifying all amounts remaining due under the note and trust deed.     Plaintiff Telford was informed first by  Amber Allen that Beehive would not allow assignment or assumption of the note and trust deed.  Subsequent calls were transferred to Paul Hess who confirmed the same information.

        31.    On September 6, 2005,  Paul Hess informed plaintiff that he would not allow TELFORD to continue the original loan and that TELFORD  would need to undergo an entirely new loan process,  meet with the approval standards of Beehive credit union,  pay new  points  and loan fees in the approximate amount of $4,000,  and be committed to a new interest rate.

        32.    On September 6, 2005,  First American Title through Jeff had contacted plaintiff at her home and informed plaintiff that  Ladd Brown had instructed First American Title to default the original sales contract, to close the escrow and to distribute the $15,000 deposit to Ladd Brown as a default fee;  thereby stealing by deception,  over $55,000 in money consideration vested by TELFORD.

33.     On September 7, 2005,  plaintiffs filed the instant action.

34.     Upon responding to this suit,  Barry Brown and Ladd Brown did continue to engage in mail fraud and extortion of plaintiffs property rights under Idaho's Racketeering Act and the Federal Mail fraud statute by using the US mails to fraudulently deny  that Barry Brown acted as an agent with power of attorney to Ladd Brown in the above stated sales transaction,  by accusing TELFORD of the crime of forgery of the assignment contract in order to financially extort TELFORD of more than $55,000, and by denying that the parties had ever discussed efforts to acquire the Beehive loan in lieu of the beginning misrepresentations made by the Browns.

34.     In addition,  the Beehive defendants did utilize the US mails and telephone wires to defraud and extort plaintiffs of property rights to assignment of the Trust Deed so that plaintiffs could sustain their purchase contract; thereby acting in conspiracy with the Brown defendants..

35.     Defendant First Amencan and Barnes are the holder of funds provided by TELFORD.  They also acted in a trustee capacity during the escrow process which remains pending.  Barnes  has personal knowledge that Ladd Brown represented that Barry Brown was his agent for all matters concerning the real property;   that TELFORD and BARRY by acts,  by deeds and by spoken words represented on at least two occasions that  the note and trust deed had been assigned to TELFORD and that the parties desired to obtain a pay off balance on the note and trust deed;    that both Barry Brown and TELFORD  twice requested that Barnes get a pay off figure from Beehive and Beehive declined to produce any pay off statement.     This officer can also authenticate the documents located in the escrow file.   Lundahl seeks an order directing Barnes and First American to  freeze the escrow account until a trial by jury has been conducted.

36.     Plaintiff hereby sues all DOES defendants and seeks permission to amend the complaint upon the discovery of any new doe defendants.

FIRST CAUSE OF ACTION
(VIOLATIONS OF THE INTERSTATE LAND SALES PRACTICES ACT)
AGAINST ALL EXCEPT FIRST AMERICAN AND BARNES

37.  Plaintiffs allege that all defendants except First American and Barnes, to date, violated the Interstate Land Sales Practices Act, *15 U.S.C. § 1703* in the following respects:

38.  Plaintiffs allege that Ladd Brown was the owner of undeveloped land and that Barry Brown was his agent.  Plaintiffs allege that the Beehive defendants also effectively acted as agents to Ladd Brown.  Plaintiffs allege that all of these defendants both directly and indirectly made use of the US mails and telephone communications in interstate commerce -  (1) with respect to the sale of a lot —  (2)  or offer to sell a lot— and (A) employed a device, scheme, or artifice to defraud plaintiffs of money or property; (B) sought to obtain money or property by means of  untrue statements  of a material fact, or omissions  to state material facts  necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading as it pertained to the  lot or subdivision.  Further, all defendants engaged  in transactions and practices in their  business which operated or would operate as a fraud or deceit  upon a purchaser.

39.  Plaintiffs allege that the Interstate Land Sales Practices Act  was designed to prevent fraud and deception  in the sale of undeveloped land.   Plaintiffs allege that they are entitled to  declaratory, injunctive and equitable relief as a matter of law pursuant to  15 U.S.C. § 1719 and money damages under § 1716.

40.     Plaintiffs allege that the original sales contract provided that it could be modified by any subsequent written agreement between the parties.

41.     Plaintiffs allege that the assignment contract is a written modification agreement which cancels a substantial part of the original sales contract in that is does not require that plaintiff pay into the escrow account $6,000 per month after the initial $15,000 deposit was made in July of 2005 ;  said $6,000 installment payments intended to pay off the debt to Beehive Credit Union.

42.     Plaintiffs allege that the trust deed provides that the note and trust deed are alienable through assignment and that Beehive has no contractual or legal  right to interfere with enforcement of  the assignment contract transferring the obligation of the note and trust deed to plaintiffs.

43.     Plaintiffs request a declaratory decree which decrees that the assignment contract modified the original sales contract,  that the assignment contract

cancels the requirement in the original sales contract that plaintiff deposit $6,000 per month to pay of the loan to Beehive Hank or the interest only provision in the escape clause installed by TELFORD, that Beehive Credit Union had no right to nullify the assignment contract, that Beehive cannot prevent the obligation under the note and trust deed from transferring to plaintiffs as the person who purchased the subject property, that Beehive cannot force plaintiff to re-apply for a new loan, pay new loan fees or assess any additional costs to plaintiffs upon assignment of the trust deed and note to plaintiffs, and that by Beehive has tortiously interfered with plaintiff's rights to acquire the property by either interfering with enforcement of the assignment contract or by interfering with the transfer of the note which occurs as a matter of law when property is sold to a bona fide purchaser and the security interest lacks a "due on sale" clause.

44. Plaintiffs allege that the assignment contract is a valid modification agreement which may not be cancelled, nullified or interfered with by any defendant.

45. Plaintiffs allege that the defendants have attempted to interfere with enforcement of the assignment agreement in order to further a scheme to extort plaintiffs.

46 Plaintiffs request that a permanent injunction order be entered specially enforcing the assignment pursuant to the contractual right to pursue specific enforcement under the original purchase contract and as a matter of law 15 U.S.C. § 1714(a).

47. Plaintiffs seek an order freezing all assets involved in the transactions as permitted under the Interstate Land Sales Practices Act, 15 U.S.C. § 1719.

48. Finally plaintiffs seek all special, general and punitive damages that the law may allow for committing a violation of *15 U.S.C. § 1703* of the Interstates Land Sales Practices Act which prohibited in part (2) with respect to the sale of any lot (A) the seller from employing any device, scheme, or artifice to defraud for the pecuniary benefit of the seller; (B) the seller from obtaining of money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale ) not misleading, with respect to any information pertinent to the lot or subdivision; and (C) the seller from engaging in any

/0.

transaction, practice, or course of business which operated or would operate as a fraud or deceit upon a purchaser.

## SECOND CAUSE OF ACTION
(VIOLATIONS OF THE FAIR HOUSING ACT AGAINST BEEHIVE)
Except First American and Barnes

48.    Plaintiffs allege that the Beehive defendants in conspiracy with the Brown defendants,  violated *42 U.S.C. § 3604 of the Fair Housing Act* (b) by  discriminating against any plaintiffs  in the terms, conditions, or privileges of sale of a dwelling or services connected  therewith,  because of sex.   Plaintiffs allege that the construction industry is dominated by the male sex and that when Telford entered into a contract with construction contractors and bankers,   and  when the defendants learned of plaintiffs naivatee with respect to construction matters and costs,    that the defendants exercised a superior position to plaintiffs,  used plaintiffs' naivatee to their advantage,   and through abuse of power and position,  discriminated against plaintiff because of their sex and non-superior status.

49.    Specifically,    the Beehive defendants in terms of their mortgage lending practices,   committed sex based and occupational based discrimination against plaintiffs by refusing to continue making the existing mortgage loan and by imposing different terms or conditions upon plaintiffs  in securing  a new and different loan against the subject real property which bore substantial refinance fees, increased points and increased interest over a 30 year period ;   all to the defendants pecuniary gain and to plaintiffs substantial damage.   The defendants conspired to violate plaintiff's rights under the  Fair Housing Act all to plaintiffs compensatory, special and punitive damages and plaintiff seeks private remedy pursuant to  *42 U.S.C. § 3613*.

50.    Plaintiff also seeks all declaratory, equitable and injunctive relief as is statutorily allowed under this cause of action.

## THIRD CAUSE OF ACTION
(VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT)
Except First American and Barnes to plaintiffs' knowledge

51.    Plaintiff  alleges that all defendants committed violations of the Idaho

Consumer Protection Act I.C. §§ 48-601 through -619.

52.    Plaintiff alleges the defendants did reach into the state of Idaho and transact *business* with citizens of this state for purpose of realizing pecuniary benefit within the meaning of BECO CORP. v. ROBERTS & SONS CONST. CO., *114 Idaho 704* (1988), *760 P.2d 1120* (This case also involved a suit where an Idaho citizen sued a Utah citizen.)    Plaintiff alleges that in the case of the Browns, the defendants contacts did derive actual pecuniary benefits from an Idaho citizen in the infusion of nearly $55,000 in monies into the Interstate Land Sales Transaction which greatly enhanced the Browns present and ongoing title interest in the property and which title could not be conveyed to plaintiff until Orem City had granted approval of the subdivided lot upon the installation of utilities to the property and the payment of hook in fees to Orem City;  matters which plaintiff funded through proceeds deposited in escrow and outside of escrow.    As to Beehive, Beehive sought to obtain a pecuniary benefit from plaintiff an Idaho citizen by forcing an early pay off of Beehive 15 year loan fixed at 3% interest and by forcing plaintiffs to refinance a new loan against the subject real property and thereby pay new loan fees, points, and a substantially higher interest, else plaintiff would lose the substantial case investment made in the property to date which greatly enhanced Beehive's present security interest in the real property as the sole lienholder.

53.    Plaintiff alleges that all defendants negotiated contract prices with plaintiffs, Idaho citizens, by phone and by facsimile on numerous occasions, within the statutory language of conducting a business act within the state of Idaho for the purposes of realizing a pecuniary benefit. As in Roberts supra, it is irrelevant that most of the defendants are not citizens of the state of Idaho.

54.    Plaintiff alleges that the defendants engaged in Unfair methods and practices within Idaho Code section *48-603* by :  Advertising goods or services with intent not to sell them as advertised, and ;  by engaging in any act or practice which was otherwise misleading, false, or deceptive to the consumer ;  all to plaintiffs economic and emotional damage in Idaho.

55.    Plaintiff further alleges that the defendants did violate Idaho code section *48-603C(c) by* knowingly or with reason to know, inducing the consumer to enter into a transaction that was excessively one-sided in favor of the alleged violator.

12.

56. Plaintiff alleges that they are entitled to compensatory, special and punitive damages against the defendants as allowed by law.

57. Plaintiff also alleges that Idaho Code section 48-607 provides that a Court is authorized to issue orders or judgments as may be necessary to carry out a transaction in accordance with consumers' reasonable expectations. Plaintiffs request that this court do so by enforcing the sale of the property to plaintiffs, by sustaining the assignment note or ordering the mortgage transferred to plaintiff by operation of law, by directing this case to a jury for a determination of money damages and by subsequently using any jury award as a set off against Beehive's Note and Trust Deed; given the high likelihood that Beehive will continue it's illegal behavior in the future against plaintiff.

58. Plaintiff also seeks such orders or judgments as may be necessary to prevent the future use or employment by any defendants of any method, act or practice declared to be a violation of the provisions of this chapter.

## FOURTH CAUSE OF ACTION
### (FEDERAL AND IDAHO RICO ACTS)

59. Plaintiff alleges that all defendants associated in fact to advance the illegal goals of Brown Construction, the enterprise, through a pattern of racketeering activity, and in furtherance thereof, conspired to effect the illegal goals of the enterprise. Plaintiff alleges that the Brown and Beehive defendants committed collectively at lease 7 acts of Federal Wire fraud, three acts of Extortion, two acts of mail fraud and one act of witness intimiation.

60. Plaintiff alleges that the Brown defendants committed multiple acts of mail fraud, wire fraud and communications fraud, when the Browns sent false matter to plaintiff by facsimile and/or left messages on plaintiff's Idaho phone telephone recorder in support of assigning the note and trust deed on the subject real property to plaintiff without any intent to support that assignment. That the defendants committed multiple acts of communications fraud when they falsely represented that costs to run utilities to the lot, pay hook in fees and to subdivide the land lot, would costs no more than $6,000 total if plaintiff used the Brown defendants excavator. Plaintiff did use the Brown defendants

excavator and the cost to plaintiff was more than 2 and ½ times the price quoted. Plaintiff alleges that she was compelled to contract with the excavator because of a $15,000 liquidated damages provision in the land purchase agreement as unilaterally imposed by the Browns in violation of the Interstate Land Sales Practices Act. Plaintiff alleges that defendants engaged in the foregoing acts for the sole purpose to extract and extort out of plaintiff, the moneys required to improve their lot and with the concealed purpose at all times, to take back title to the lot and never convey the property to plaintiff. Plaintiff alleges that at all times, it was plaintiff's money that was used for the economic advancement of the property as was intended by the Browns. Plaintiff alleges that phone wires and telephone calls were utilized at least five times by the Browns in pursuit of the fraudulent scheme and that each use of a communications device constituted a separate offense.

61.     Plaintiff alleges that all times herein mentioned the Browns represented to plaintiff and to First American Title that Barry Brown had power of attorney for Ladd Brown to implement and  exercise all transactions concerning the subject real property. Plaintiff alleges that the Browns consented to conveyance of a note and trust deed to plaintiff by phone and in writing, that the Browns left messages on plaintiff's phone recorder consenting to such conveyance, and that Barry Brown executed a written conveyance document in the form of an assignment to plaintiff, with the purpose and intent to disclaim the document as soon as plaintiff contributed all monies towards improvement of the property. That the Browns denied execution of the assignment document when plaintiff made demand for performance thereof and that the Browns conspired with the Bank, Beehive Credit Union,  to obstruct enforcement of the assignment for purposes of pecuniary gain and to defraud plaintiff of moneys and other things of value.

62.     Plaintiff alleges that the Browns never withdrew their contention that the assignment was valid hence intending to use the instrument to extort plaintiff within the meaning of Idaho and Utah's  extortion statutes and the federal Hobbs act..

63.     Plaintiff alleges that LADD and BARRY conspired with Beehive to not alienate the note and trust deed to TELFORD in spite of the assignment executed with BARRY as agent to LADD or in spite of the contracted transfer of title in the property to plaintiff as a matter of law based upon plaintiffs purchase of the property and successor in interest capacity.

14.

64.     Plaintiff alleges that Ladd  Brown committed a predicate act of wire fraud and attempted to commit a separate offense of theft by deception  when he called First American Title on August 22, 2005 and procured Barnes to cancel the escrow and deliver TELFORD's $15,000 deposit to LADD,  both without consulting TELFORD and in violation of the escape provision in the original sales contract and the assignment contract.

65.     Plaintiff alleges that the  Beehive defendants committed at least  4 acts of wire fraud and extortion when they either received or made calls to TELFORD and informed TELFORD without contractual or legal justification that the note and trust deed were not assignable or assumable; a factually false statement pursuant to the language of the trust deed; thus extorting property rights from TELFORD.  Plaintiff alleges that Beehive committed at least two acts of mail fraud by mailing to First American a rejection notice of TELFORD's right to assignment or assumption of the note and by mailing to TELFORD a similar rejection notice;  all representations therein being patently false.

66.  Plaintiff alleges that the Beehive defendants all committed blatent acts of extortion by falsely representing to plaintiff that the only way plaintiff could acquire the note and deed from Beehive is if plaintiff refinanced same, paid Beehive additional refinance fees of $4,000 and paid Beehive increased interest at the rate of 7.5%,  the interest rate of a construction loan. Plaintiff alleges that because the trust deed contained no due on sale clause which prevented alienation of the Note and trust Deed,  that Beehive extorted and  attempted to extort plaintiff without any legal justification and in violation of Utah, Idaho and the federal extortion statutes.

67.     Plaintiff alleges that the Browns and Beehive did conspire one with another to defraud and extort  TELFORD of rights to obtain title to the property and to the mortgage which transferred by operation of law upon plaintiff's purchase thereof.

68.     Plaintiff alleges that under state law,  she is entitled to a statutory injunction and hereby seeks said injunction to prevent further damages.

69.     Plaintiffs are entitled to treble damages upon final judgment.


FIFTH  CAUSE OF ACTION
(TORTIOUS INTERFERENCE WITH ASSIGNMENT CONTRACT AGAINST
BEEHIVE, HESS AND ALLEN )

70.     Plaintiff alleges that the Beehive defendants conspired to tortiously interfere with the assignment contract executed by Ladd Brown's authorized agent Barry Brown and/or to interfere with transfer laws associated with the selling of real property. Plaintiff alleges that the interference tort was for monetary gain and much to plaintiff's pain, suffering, mental anguish and additional damages.

71.     Plaintiff alleges that it is undisputed that Ladd Brown pursuant to a conspiracy with Beehive,  contacted First American title and solicited  this title agency to default the original contract wholly avoiding enforcement of the assignment contract and/or the transfer provisions that took effect by operation of law upon the sale of real property unless specifically prohibited by the trust deed.     The interference took place  for obvious pecuniary gain after plaintiffs vested another $39,600 in money in the real property,  on top of depositing $15,000 into the escrow for purposes of completing the sales transaction. Plaintiff alleges that since the contract was interfered with resulting in this lawsuit,  she has suffered additional losses by way of another $25,000 for lost contracts pertaining to the real property.

72.     Plaintiffs alleges that the Beehive defendants interfered with the performance of plaintiffs sales contract pursuant to a conspiracy with the Browns by refusing to implement transfer of the Note and trust Deed to plaintiff as a matter to plaintiff as provided by operation of law.   The Beehive defendants interference   caused all construction process on the property to halt,  caused plaintiff to lose the benefit of or forced the default of some of the other third party contracts relating to the improvement of the property,    deprived  plaintiff of the enjoyment of  her property and interfered with plaintiff's prospective economic advantages to be obtained from ownership and improvement of the property.    In addition, the defendants have inflicted severe emotional and mental distress upon plaintiffs by acting in an illegal manner in tortiously interfering with a legally authorized contracts,  all to plaintiff's present and future economic damage.

73.     Plaintiff therefore seeks all compensatory, special and punitive damages as the law may allow.

### SIXTH CAUSE OF ACTION
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

74.   Plaintiff Alleges that the Browns breached the covenant of good faith and fair dealing when they failed to honor the escape provision in the original sales contract which permitted that LUNDAHL pay the interest on the Beehive Loan . Plaintiff also alleges that the Browns violated the same covenant in the assignment contract which was authorized by law.

75.   Plaintiff alleges that the Beehive defendants violated the covenant of good faith and fair dealing when they refused to honor the assignment provision in the note and trust deed and obstructed transfer thereof when the note and trust deed dod not contain a due on sale clause.

76.   Plaintiffs seeks all compensatory and punitive damages as the law may allow.

## SEVENTH CAUSE OF ACTION
## (FOR CONSTRUCTIVE TRUST AGAINST FIRST AMERICAN, BARNES AND DOES)

77.   Plaintiff alleges that First American is in possession of a $15,000 deposit made by plaintiff and that various third parties are in possession of large sums of monies paid by plaintiff pursuant to improvement contracts executed by plaintiff.

78.   Plaintiff moves for an order placing a constructive trust on the assets presently held by First American barring dissipation of those assets without plaintiff's express permission.

79.   Plaintiff also moves for an injunction order against DOE defendants barring the frustration of any contract relating to improvement of the real property whose default provisions have not yet been exercised, as a result of the defendants conduct herein.

WHEREFORE, PLAINTIFF PRAYS FOR THE FOLLOWING:

1.   FOR ALL COMPENSATORY, SPECIAL AND PUNITIVE DAMAGES AUTHORIZED BY LAW;

2.   FOR TREBLE THE FINAL  JURY AWARD AS PROVIDED BY RICO;

3.   FOR ALL DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF ALLOWED BY LAW;

4.   FOR ATTORNEYS FEES AND COSTS;

5.   FOR  A FREEZE ORDER;

6.   FOR A CONSTRUCTIVE TRUST ORDER;

7.   FOR TRIAL BY JURY; and

8.   FOR PRE AND POST JUDGMENT INTEREST.

DATED:  NOVEMBER 8, 2005

H. M. TELFORD
Attorney Pro Se

VERIFICATION

I verify under Penalty of Perjury
That the foregoing statements are true
of correct pursuant to 1746(2)

DM. Telford

18.